UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |
|---|---|
| ONE SOURCE ENVIRONMENTAL, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| M + W ZANDER, INC., M + W U.S., | : |
| INC., M + GROUP GMBH, M + W | : |
| PRODUCTS GMBH, AND TOTAL | : |
| FACILITY SOLUTIONS, INC., | : |
| | : |
| Defendants. | : |
| | : |

Case No. 2:12-cv-145

## Opinion and Order

Plaintiff One Source Environmental, LLC ("One Source") brings this suit against Defendants M + W U.S., Inc. ("M + W U.S."); M + W Products GmbH ("M + W Products"); M + W Group ("M + W Group"); and Total Facility Solutions ("TFS") regarding a 2004 Manufacturer's Representation Agreement ("Agreement") between One Source and M + W Zander, Inc. (the previous incarnation of M + W U.S.).[1]  One Source has brought claims for breach of contract and breach of the implied covenant of good faith and fair dealing against all four defendants and claims for tortious interference against M + W Group and M + W Products.  The complaint also seeks punitive damages.  One

---

[1] M + W U.S. was called M + W Zander, Inc. at the time of the 2004 Agreement. Both parties concede that the name has been changed and thus M + W Zander, Inc. is removed as a party to this action.

Source has twice amended its complaint, most recently to further explain its claims against the German Defendants and TFS (collectively "nonsignatory defendants").  Defendants now move to dismiss the Second Amended Complaint ("SAC") on the grounds that One Source lacks standing, for failure to state a claim under 12(b)(6), and for lack of personal jurisdiction over the German Defendants.  They also move for partial summary judgment.

For the reasons stated below, the motion to dismiss is **granted in part and denied in part**.  The motion to dismiss the breach of contract and implied covenant of good faith and fair dealing claims against the nonsignatory defendants (Counts III-VI) is **granted**.  The motion to dismiss the SAC for lack of standing; the motion to dismiss the implied covenant of good faith and fair dealing claim against M + W U.S. (Count II); the motion to dismiss the tortious interference claims (Counts VII and VIII); the motion to dismiss for lack of personal jurisdiction over the German Defendants; and the motion to dismiss the claim for punitive damages (Count IX) are **denied.** The Court also **denies** Defendants' motion for partial summary judgment.  This leaves the SAC as follows: Count I, II, VII-IX remain; Counts III-VI are **dismissed without prejudice**.

### FACTUAL AND PROCEDURAL BACKGROUND

One Source originally filed this suit in state court on February 22, 2011, and Defendants removed to this Court on or

2

around June 22, 2012.  One Source then filed an amended complaint on November 20, 2012.  The amended complaint alleges breach of contract, breach of an implied covenant of good faith and fair dealing, tortious interference with contract, and tortious interference with prospective business relations.  One Source also seeks punitive damages.  Following a hearing in June 2013 wherein the Court directed that the parties engage in limited jurisdictional discovery, One Source amended its complaint a second time, and Defendants have now moved to dismiss SAC.

## I. Manufacturer's Representative Agreement

This case arises out of a January 16, 2004, Manufacture's Representative Agreement made between One Source Environmental Testing Services (now One Source) and M + W Zander, Inc. (now M + W U.S.).[2]  The contract is entitled "M + W Zander Manufacturer's Representative Agreement."  SAC ¶ 30.  In the Agreement, One Source is identified as the "Representative" and M + W Zander, Inc. is identified as the "Company."  It is signed on behalf of M + W Zander, Inc. by its vice-president, Ralf Graber.

The Agreement makes One Source the exclusive sales representative for a "territory" encompassing New England,

---

[2] The parties originally entered into a nearly identical one-year agreement in 2003, and proceeded to enter into an open-ended version in 2004.  The Agreement at issue in this action is the 2004 Agreement.

Quebec, and the State of New York (with the exception of New York City, a shared territory) for all products marketed by "the Company." SAC ¶ 31. As Representative, One Source agrees to market and sell products "bearing the Company trademark" and services to customers within the territory. SAC ¶ 39; Agreement ¶ 4 (SAC Ex. B). The Agreement also imposes broad confidentiality and non-competition obligations on One Source. ¶¶ 10, 12. In return, the Agreement provides that One Source will receive a commission on sales of the Company's products within the sales territory. ¶ 41. The Agreement does not specify the amount of commission due to One Source on each sale; One Source alleges that this commission varied depending on the level of involvement One Source had in the transaction. *Id.* The Agreement has no termination date but is subject to the right of the Company and/or the Representative to cancel at any time upon thirty days' notice. ¶ 32.

The parties to the Agreement have both undergone changes in structure and nomenclature since the formation of the 2004 Agreement. According to the SAC, the Agreement was originally made between One Source Environmental Testing Services ("OSETS") and M + W Zander, Inc., the Phoenix-headquartered U.S. division of German company M + W Zander AG. SAC ¶ 3. At some point after the Agreement was signed, M + W Zander, Inc. became M + W U.S., a Delaware corporation with its principal place of

4

business in Watervliet, New York.  ¶ 7.  The SAC brings claims
against M + W U.S. as the successor entity to M + W Zander, Inc.
¶ 95.

   At the time of Agreement, Plaintiff was known as "One
Source Environmental Testing Services," a trade name registered
by Jeffrey Jimmo, One Source's founder, owner, and principal, in
1999.  ¶ 2.  Jimmo did business under this registered trade name
until 2004, when he registered the business as a limited
liability company ("LLC") and shortened the name.  While One
Source LLC is a new legal entity, the SAC contends that it
*replaced* and is therefore a continuation of OSETS; upon the
creation of the LLC, the sole proprietorship ceased to exist and
was effectively converted into the LLC.  *Id.*  After the
conversion, Jimmo remained the owner and operator, the assets
and business remained the same, there was no change in
management, and the entity retained the same address and
telephone number.  One Source therefore contends that it is the
successor in interest to the original Agreement.

## II.  Nonsignatory Defendants

   One Source concedes that the Agreement was signed on behalf
of M + W Zander, Inc., a discrete entity that has now become M +
W U.S. SAC ¶¶ 3, 95.[3]  However, One Source also brings claims

---

[3] The Agreement clearly states that it is signed by Ralf Graber as a
representative of an M + W entity based out of Phoenix, Arizona.

against several nonsignatory entities that it alleges are parties to the contract on the basis of apparent authority: M + W Group and M + W Products (the "German Defendants"), and TFS.

**A. The German Defendants**

In addition to its claims against M + W U.S., One Source brings claims for breach of contract, breach of an implied covenant of good faith and fair dealing, and tortious interference against two German entities: M + W Group and M + W Products. The SAC alleges that the Agreement was made between One Source and M + W Zander, Inc. to be the exclusive representative of M + W Group, a German business entity that manufactures clean room components and devices. ¶¶ 3, 8. M + W Products, another German business entity, manufactures products for M + W Group. M + W Products is wholly owned by M + W Facility Engineering GmbH, which is in turn wholly owned by M + W Group. ¶ 10. The SAC alleges that M + W Group and M + W Products are both parties to the Agreement based on the theory that Ralf Graber and M + W U.S. had the apparent authority to bind them to the Agreement on their behalf.

In furtherance of its apparent authority argument, One Source points to several facts that, in its view, support a finding that all of the M + W divisions "functionally acted as one entity, directed by M + W Group GmbH." SAC ¶ 132. For instance, One Source notes that M + W had one website. In 2002,

6

Marvin Joanis (of M + W U.S.) directed Plaintiff to see "our webpage" to see "our products" and provided the German website of M + W Group.  ¶ 133.  One Source also notes that M + W U.S. shared the same letterhead with its parent, ¶ 149, and that the e-mail addresses for all M + W employees used the same handle ([name]@mw-zander.com), ¶ 150.  It also cites an email between representatives of M + W U.S. and another German M + W subsidiary stating that One Source could help "us" as proof that Defendants internally "conceived of the relationship with Plaintiff as being between Plaintiff and M + W."  ¶ 135.

One Source also puts forth evidence to demonstrate that it actually believed at the time of the Agreement that it was contracting with M + W in both the U.S. and Germany.  In support, Plaintiff quotes an email from One Source to Mr. Joanis stating that they "are looking forward to making M-W Zander an even bigger succes [sic] in the U.S."  ¶ 138.  Plaintiff claims that this indicates that One Source believed it was doing business with M + W Germany.  Further, Plaintiff cites communications between Mr. Jimmo and Mr. Breuer of M + W Facility Engineering as providing support for the reasonable belief that the German Defendants were parties to the 2003 and 2004 Agreements.  ¶¶ 140-41.

Plaintiff also points to the Agreement itself as evidence of M + W U.S.'s apparent authority.  Specifically, Plaintiff

notes that the Agreement was titled "M + W Zander Manufacturer's Representative Agreement," not "M + W Zander, Inc. [indicating the U.S. Subsidiary] Manufacturer's Representative Agreement." ¶ 143. One Source notes that the only "manufacturer" of M + W products was located in Germany, thus implying that M + W Products and M + W Group must have been parties to the contract. ¶ 144. One Source also notes that under the Agreement, it agreed to promote the sale of assorted devices "bearing The Company trademark," and that because the only trademark-owning entity at the time was M + W Group, it would be reasonable for Plaintiff to assume that M + W Group was a party to the Agreement. ¶ 145. Finally, Plaintiff states "upon information and belief" that the signatory of the Agreement, Ralf Graber, was directly employed by M + W Group; Defendants assert in their Motion to Dismiss that this is not the case.

In addition to the communications before the Agreement and the Agreement itself, Plaintiffs point to Defendants' conduct *after* the Agreement was executed as additional support for M + W U.S., Inc.'s apparent authority to bind the German defendants. In an email dated after the Agreement, an employee of M + W U.S., Marvin Joanis, stated to an employee of TFS that he reported "directly to Germany" and that German entities had given him "approval" of M + W U.S.'s projects. ¶¶ 151-52. Plaintiffs also cite a 2009 letter from M + W U.S., Inc.'s Rick

Grauke providing a proposal on behalf of M + W Products.   ¶ 158.
Finally, Plaintiffs refer to another email from M + W U.S.
Inc.'s Bill Spain to Friedrich Schumm of Germany, in which he
states that

> [t]he selling of these chambers is based, somewhat, on
> the high quality of German engineering.  We try to
> create the illusion, if you will, that the reason that
> the chamber functions so precisely is because of
> German engineering.  To sustain this illusion, if it
> is an illusion, we need to insist that only
> experienced German engineers are qualified to perform
> final balance and tuning.  Someone from Germany, or
> someone with a German accent, needs to be in Vermont
> October 11-15. I don't see this ever changing.

¶ 160.  One Source also submits that in practice, it performed
warranty work on M + W Group and M + W Products's products sold
in Vermont and that this further demonstrates that the German
Defendants were parties to the Agreement.  ¶ 155-56.  From these
facts, Plaintiffs conclude that part of Defendants' business
plan is to portray M + W U.S. as an agent of M + W Group and
that "Plaintiff reasonably believed that M + W Group [] and M +
W Products [] were parties to the Agreement by virtue of their
agency relationship with [M + W U.S.]"  ¶ 161.

### B. Total Facility Solutions

One Source also brings contract claims against TFS, another
subsidiary that does electrical and mechanical construction for
M + W U.S.  ¶ 107.  Plaintiffs contend that TFS was understood
to be a branch of M + W U.S. at the time of the Agreement.  ¶

108.  In support of this assertion, Plaintiffs quote a 2004 email from M + W U.S.'s Brian Edgerton that describes TFS-Electrical as "the self-performing branch of M+W Zander."  ¶ 109.  The SAC also notes that M + W U.S. and TFS share the same letterhead, signature block, e-mail address, and corporate office.  ¶¶ 110-111.  The two also share the same CEO and Executive Vice President.  ¶ 115.  One Source therefore contends that TFS is the successor to the branch of M + W U.S. that had previously performed electrical and mechanical construction and that this makes TFS a party to the 2004 Agreement.  ¶ 116.

### III. Alleged Breach and Termination of Agreement

One Source discovered sometime in 2010 that it was not receiving commissions on all of M + W's work in the territory. In January 2011, Plaintiff emailed Markus Huegle at M + W Products and advised him of One Source's entitlement to a commission on a certain project within the Territory.  ¶¶ 80-82. A few months later, Ralf Graber sent Plaintiff a letter dated April 14, 2011, terminating the Agreement.  ¶ 85.  The termination arrived with no advance warning or explanation. From this, Plaintiff concludes that the Agreement was terminated in response to his request for compensation under the Agreement, and that the decision to terminate was made by either M + W Group or M + W Products.  ¶ 87.

One Source alleges that Defendants acted in bad faith based on an email in which a M + W U.S. employee wrote that "Ralf [Graber] doesn't like [Jimmo] for multiple reasons. He is good for us in Burlington but not necessarily elsewhere." ¶ 63. One Source also argues that Defendants did not want to honor the Agreement elsewhere in the Territory because they did not want to pay One Source additional commissions. ¶ 64. The SAC submits that One Source was denied a significant amount of compensation in commissions as a result.

One Source filed a nine-count suit alleging breach of contract and breach of the implied covenant of good faith and fair dealing against all parties (Counts I-VI); tortious interference and tortious interference with prospective business relationship/unfair competition against M + W Group and M + W Products (Counts VII and VIII); and seeking punitive damages (Count IX). M + W U.S. has counterclaimed against One Source for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference with contract, interference with prospective contractual relations and misrepresentation. The Complaint has twice been amended, most recently after a June 2013 hearing wherein the Court directed limited discovery on the role of the nonsignatory defendants. Defendants have moved to dismiss the SAC and for partial summary judgment on the grounds that One Source lacks

11

standing, for failure to state a claim under Rule 12(b)(6), and for lack of personal jurisdiction over the German defendants.

## DISCUSSION

### I. Standard of Review

On a motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6), the Court will dismiss only if the Plaintiff cannot "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). For purposes of this inquiry, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of One Source. *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007).

Defendants have alternatively moved for partial summary judgment. On a motion for summary judgment, the party seeking summary judgment bears the responsibility of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when no rational jury could find in favor of the nonmoving party may summary judgment be granted to the moving party. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721 (2d Cir. 1994). Thus, the Court must resolve all ambiguities and draw all reasonable inferences in favor of One Source when assessing the summary judgment motion.

### II. Standing

Defendants move to dismiss the entire SAC on the grounds
that One Source is not a party to the agreement and cannot bring
suit for lack of standing.  It bases this argument on the fact
that the signatory to the contract was One Source Environmental
Testing Services, the trade name for Jimmo's sole
proprietorship, while Plaintiff in this action is One Source
Environmental, LLC, the limited liability corporation that
replaced Jimmo's former sole proprietorship.  Plaintiff asserts
that it nonetheless has standing because One Source is the
successor in interest to OSETS and to the Agreement.

"Successor liability is a question of State law." *LiButti
v. United States*, 178 F.3d 114, 124 (2d Cir. 1999).[4]  Under
Vermont statutory law, a partnership or a limited partnership
that has been converted into an LLC "is for all purposes the
same entity that existed before the conversion."  Vt. Stat. Ann.
ch. 11 § 3123(a).  Thus, all "property owned . . . [and] all of
the rights, privileges, immunities, powers and purposes" of the
pre-LLC partnership are vested in the newly formed LLC.  *Id.* §
3123(b)(1),(4).

Vermont courts have not addressed whether this provision
applies to sole proprietorships; however, the Connecticut

---

[4] Jurisdiction of this matter is based on diversity, 28 U.S.C. § 1332,
and therefore state law applies.

Supreme Court interpreted a very similar state LLC law to find that sole proprietorships ought to be treated the same way for purposes of successor liability. *See C & J Builders & Remodelers, LLC v. Gisenheimer*, 733 A.2d 193 (Conn. 1999). In *C & J Builders*, the plaintiff entered into a contract as a sole proprietorship. After signing the agreement, the plaintiff began conducting its business as an LLC pursuant to Connecticut law governing the formations of LLCs (a law very similar to Vermont's). *Id.* at 416-17. Despite the LLC formation, the new entity assumed "virtually the same name" as the sole proprietorship, maintained the same address, and carried out the same business operations. *Id.* at 417. It also specifically continued carrying out the contract at issue. *Id.* When a dispute arose under the contract, the plaintiff filed an action against the defendants, to which the defendants responded by claiming the plaintiff LLC was not a party to the contract. *Id.* at 418. The Supreme Court of Connecticut disagreed with the defendants, finding that the plaintiff LLC was a party to the contract because it was a "successor in interest" to the sole proprietorship. *Id.* at 422.

In its analysis, the court explained that "the term successor in interest ordinarily refers to a corporation that by a process of amalgamation, consolidation, or duly authorized legal succession, has become invested with the rights and has

14

assumed the burdens of another corporation." *Id.* at 419
(quoting *Bouchard v. People's Bank,* 594 A.2d 1, 4 (Conn. 1991)).
It determined that the plaintiff so qualified by looking to
Connecticut's LLC act as instructive.  The Connecticut statute,
like the Vermont law, dictates that a general or limited
partnership that is converted into an LLC is "for all purposes
the same entity that existed before the conversion." *Id.* at
420-21 (quoting Connecticut statute).  The court found no reason
to distinguish between general partnerships and sole
proprietorships, and concluded that the rights and obligations
of the sole proprietorship were transferred to the limited
liability company by operation of law.  *Id.* at 422.

     While the Vermont Supreme Court has not ruled on this
precise issue, the Court finds the reasoning in *C & J Builders*
to be applicable to this case.  The Connecticut and Vermont LLC
laws contain identical language, and the facts of the two cases
are nearly indistinguishable: as in *C & J Builders*, the One
Source LLC maintained "virtually the same name," carried on the
same business, retained the same management, and, importantly,
continued to honor the Agreement.  Also importantly, *Defendants*
continued to perform under the 2004 Agreement.  M + W U.S.
continued to work with One Source LLC in the same manner that it
had worked with Jimmo's sole proprietorship, and made payments
to Plaintiff in its new name.  Finally, M + W U.S. has also

filed breach of contract counterclaims against One Source LLC in this action, which further supports a finding that One Source is a party to the contract.  One Source therefore has standing to bring this action as the successor in interest to the Agreement and the motion to dismiss is denied on this ground.[5]

## III. Contract Interpretation Claims

Defendants also move to dismiss the SAC for failure to state a claim under Rule 12(b)(6), essentially on the grounds that One Source's proffered interpretation of the contract lacks merit — that is, the parties disagree about precisely how much commission One Source is due under the contract.  One Source submits that the parties interpreted the Agreement to award One Source a fixed commission on all sales and services performed in the Territory, regardless of whether One Source was directly involved with the transaction.  This interpretation contrasts with the express contractual language limiting One Source's commission to a percentage of *product* sales.  One Source bases its interpretation on the fact that in practice, M + W U.S. paid One Source a commission on total cost of work, never on just products.  ¶¶53-54.

---

[5] Defendants also argue that One Source lacks standing on the grounds that the Agreement cannot be assigned and that because One Source did not exist at the time of the Agreement, it cannot be a third party beneficiary to the contract.  Because the Court finds One Source to be the successor in interest to OSETS, these arguments are rendered irrelevant.

Defendants argue that One Source's theory constitutes a contract modification, and that it should be dismissed for failure to meet the "high evidentiary burden" required to show such modifications. *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000).  Under Delaware law,[6] "[w]ritten contracts can be modified by unwritten conduct on the part of the parties.  The burden is on the party seeking the modification to demonstrate that a contract has been modified." *Haft v. Dart Group Corp.,* Civ. No. 93-384, 1994 WL 828326, *12 (D. Del. Aug. 17, 1994)(citations omitted).  Such modification must be proven with "specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." *Cont'l Ins. Co.*, 750 A.2d at 1230 (quoting *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. 1979)).  Defendants argue that One Source has failed to meet these requirements because any purported modification was not made in writing and that, in Defendants' words, it is "uncontroverted" that there was no oral agreement as to this modification.  They further submit that One Source's claims are based on imprecise language and are insufficiently

---

[6] Delaware law applies to questions of contract modification and interpretation.  The 2004 Agreement has a choice of law provision applying Delaware law, and "absent any evidence of the parties' intent to the contrary, any subsequent modification of those rights and liabilities . . . would still be governed by the choice of law provisions." *RGC Int'l Invs., LDC v. Ari Network Servs., Inc.*, CIV. 03-0003-SLR, 2004 WL 189784, at *3 (D. Del. Jan. 22, 2004).

"specific and direct" to meet the modification requirements.
Finally, they argue that any purported modification lacks
consideration.  Defendants thus conclude that the modification
claims should be dismissed, or in the alternative, that the
Court should grant summary judgment against Plaintiffs on this
issue.

Regardless of whether Defendant's modification argument has
merit, it does not support dismissal under Rule 12(b)(6).  First
of all, Plaintiff's commission theory rests on the parties'
*interpretation* of the Agreement, not on a modification.  One
Source has pled sufficient facts in its complaint to satisfy the
*Iqbal/Bell Atlantic* plausibility standard in support of its
interpretation.  One Source pled that *in practice*, the contract
was performed in a manner consistent with its interpretation of
the Agreement (the payments represented 3% of total cost of
work) and that One Source never received commissions as a
percentage of only product sales.  In fact, Plaintiff submits
that One Source was *never* paid pursuant to the express terms of
the Agreement.  If the Court accepts the facts as pleaded as
true, as it must at the Rule 12 stage, Plaintiff has pled
sufficiently to raise a plausible claim in support of its
interpretation of the contract.

Defendants alternatively seek determination of this issue
under Rule 56.  However, this issue cannot yet be decided at

18

summary judgment.  The facts underlying Plaintiff's contract interpretation claims are disputed — for example, Plaintiff cites numerous emails indicating that the parties construed the agreement to apply to total cost of work.  *See* Disputed Facts ¶ 26.  Furthermore, the parties have not been afforded full discovery on this issue.  Discovery thus far has been limited to jurisdictional issues and the parties have not yet performed substantive depositions relating to contract interpretation or modification.  While it is true that Delaware courts have established a high evidentiary burden to show course of conduct modifications, this high burden does not justify summary judgment at this time because One Source has not yet had the opportunity to produce evidence in support of its contract interpretation theory.  *See ING Bank, FSB v. American Reporting Co., LLC*, 843 F. Supp. 2d 491, 499 (D. Del. 2012) (denying summary judgment where course of conduct modification remained issue of fact for jury to decide).  The motion for partial summary judgment is therefore denied.

## IV.  Implied Covenant of Good Faith and Fair Dealing against M + W U.S. (Count II)

In addition to its breach of contract claim against M + W U.S., One Source also brings a claim against M + W U.S. for breach of the implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing is implied by law in

all contracts, to protect against "conduct which violates
community standards of 'decency, fairness, or reasonableness.'"
*Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 932 A.2d
1045, 1050 (quoting *Carmichael v. Adirondack Bottled Gas Corp.*,
635 A.2d 1211, 1216 (Vt. 1993)).  However, Vermont courts do not
recognize a separate cause of action for violation of the
covenant where the plaintiff "pleads a breach of contract claim
based on the same conduct." *Citibank N.A. v. City of
Burlington*, 2:11-CV-214, 2013 WL 4958645, at *13 (D. Vt. Sept.
13, 2013)(quotations omitted); *see also Monahan*, 2005 VT 110 ¶
54 n.5, 179 A.2d at 316 n.5 ("[W]e will not recognize a separate
cause of action for breach of the implied covenant of good faith
and fair dealing when the plaintiff also pleads a breach of
contract *based upon the same conduct*."); *Harsch*, 2007 VT 70 ¶
14, 932 A.2d at 1050 ("A breach for violation of the implied
covenant may form a separate cause of action than for breach of
contract, as long as the counts are based on different
conduct.").[7]

---

[7] Delaware law does not conflict with Vermont law.  Under Delaware law,
there must be a contractual relationship between the parties in order
to bring a claim under the implied covenant of good faith and fair
dealing, *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, No. 19875,
2005 WL 5757653, at *13 (Del. Ch. July 27, 2005), and duplicative
claims are not allowed, *Stewart v. BF Bolthouse Holdco, LLC*, C.A.No.
8119, 2013 WL 5210220, at *16-17 (Del. Ch. Aug. 30, 2013) (finding
covenant claim to be foreclosed by breach of contract claim).  Because
Delaware and Vermont law are in accord on this issue, there is no
conflict of laws to resolve.  *Baltus-Michaelson v. Credit Suisse First
Boston, LLC*, 116 F. App'x 308, 310 n.1 (2d Cir. 2004) (explaining that

Defendants contend that the implied covenant claim against M + W U.S. should be dismissed as duplicative of the breach of contract claim because Plaintiff's claim under the covenant of good faith and fair dealing is premised on the same conduct that underlies the breach of contract claim. One Source's litigation all arises out of the 2004 Agreement, and both the contract and implied covenant claims are based primarily on the fact that Plaintiffs were deprived of commissions and any profits therefrom. Because One Source's arguments regarding M + W U.S.'s failure to pay commissions derive from express language in the 2004 Agreement, they properly fall under the breach of contract claim and cannot sustain an additional cause of action under the covenant of good faith and fair dealing. *See Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n.5, 893 A.2d at 316 n.5 ("[B]reaches of express contractual terms sound in contract."); *Citibank*, 2013 WL 4958645, at *13 (dismissing count for breach of the implied covenant of good faith and fair dealing where "premised on precisely the same conduct as [the breach of contract claim]").

However, Plaintiff's good faith and fair dealing claim against M + W U.S. raises one additional allegation that makes it non-duplicative: it asserts that the termination of the

---

where there is no conflict of laws, "the choice of law does not matter").

contract was made in bad faith, as evidenced by the fact that M

+ W U.S. apparently terminated the Agreement in response to

Plaintiff's request for commissions.  The Plaintiff therefore

alleges that the termination was made based on personal ill

will, not dissatisfaction with One Source's performance, and

that the contract was terminated in response to Plaintiffs'

request that the terms of the Agreement be honored.  SAC ¶ 102.

This supports a plausible inference that M + W U.S. terminated

the contract in bad faith.  As the contract was terminable at

will, this termination could not form an element of the breach

of contract claim.  Because One Source has provided independent

conduct to support its implied covenant of good faith and fair

dealing claim, Defendants' motion to dismiss Count II is denied.

## V. Contract and Implied Covenant Claims against Nonsignatory Defendants (Counts III-VI)

One Source concedes in the SAC that M + W U.S. is the

signatory defendant on the manufacturer's agreement.[8]  One Source

nonetheless brings additional claims for breach of contract and

the implied covenant of good faith and fair dealing against

three nonsignatory defendants — TFS, M + W Group, and M + W

---

[8] In the SAC, Plaintiff states that M + W Zander, Inc. (the signatory) was the "U.S. division of the German company M + W Zander AG," ¶ 3; that it has since been succeeded by M + W U.S., Inc., ¶ 95; and that One Source and M + W Zander, Inc./U.S., Inc. are the parties bound by the Manufacturer's Representative Agreement, ¶ 95.

Products — based on the theory that M + W U.S. had apparent authority to bind them in contract.

Defendants move under Rule 12(b)(6) to dismiss the breach of contract and implied covenant claims against the nonsignatory defendants on the grounds that they were not in privity of contract with One Source.  Entities generally cannot be sued for breaching a contract to which they are not a party.  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Connors v. Dartmouth Hitchcock Med. Ctr.*, 2:10-cv-04, 2:12-cv-51, 2013 WL 3560946, at *11 (D. Vt. July 11, 2013) (noting "the general principle of contract law that only a party to a contract may be sued for breach of that contract").  Furthermore, there can be no implied covenant claim where there is no contractual relationship between the parties.  *Monahan*, 2005 VT ¶ 54 n.5, 893 A.2d at 316 n.5  ("A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties. . . .").[9]  Thus, if the nonsignatory parties are not bound by the

---

[9] Again, Delaware law does not conflict with Vermont law and there is no conflict of laws to resolve.  *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003) ("There is no doubt that a fundamental principal of contract law provides that only parties to a contract are bound by that contract."); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, No. 19875, 2005 WL 5757653, at *13 (Del. Ch. 2005) (requiring a contractual relationship between the parties in order to bring a claim under the implied covenant of good faith and fair dealing).

Agreement, the breach of contract claims and implied covenant claims must be dismissed.  The Court will address the claims against the German Defendants and TFS separately.

**A. German Defendants (Counts V and VI)**

One Source brings claims for breach of contract and the implied covenant of good faith and fair dealing against the German Defendants as the parent corporation of M + W U.S. "Generally speaking, a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club, Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993).  One Source claims that M + W Group and M + W Products should nonetheless be liable under the contract because they conferred apparent authority on M + W U.S. as an agent to bind them.

Apparent authority vests where "the conduct of the *principal*, communicated or manifested to the third party, . . . reasonably leads the third party to rely on the agent's authority." *Lakeside Equip. Corp. v. Town of Chester*, 2004 VT 84, ¶ 7, 865 A.2d 422, 426 (emphasis added) (internal quotations omitted).  Apparent authority thus derives from "misleading conduct on the part of the principal—not the agent." *Doe v. Forrest*, 2004 VT 37, ¶ 23, 853 A.2d 48, 57 (quotation omitted); *accord Jurimex Kommerz Transit GMBH v. Case Corp.*, No. Civ A.

24

00-83-JJF, 2006 WL 1995128 (D. Del. July 17, 2006) ("[I]n order
to establish an agency relationship, Plaintiffs must point to
words or actions *of the principal*").

   One Source claims in the SAC that M + W U.S. had the
apparent authority in 2004 to bind M + W Germany to an Agreement
with One Source based on the general theory that all of the M +
W bodies "functionally acted as one entity, directed by M + W
Group."  SAC ¶ 132.  However, One Source does not actually
provide any facts to indicate M + W Group acted in such a way as
to provide its subsidiaries with apparent authority to bind the
parent.  In the SAC, One Source provides only one example of
communication between One Source and a German entity — two
emails between Jimmo and Mr. Braeuer, a representative of M + W
Facility Engineering (which owns M + W Products).  In the
emails, Braeuer discussed the very first contract to build a
chamber at IBM Essex Junction.  SAC ¶ 140-41 (Exhibit Q).  These
emails predated the Agreement and referred only to an individual
project.  They make no reference to M + W U.S., much less to M +
W U.S.'s authority to bind the German entities, or to the
Representative Agreement.  Furthermore, these emails are not
even conduct communicated by the principal to the third party:
Brauer is identified as a representative of another subsidiary,
not M + W Group or M + W Products.  These emails, standing

25

alone, do not constitute sufficient conduct to vest apparent authority in M + W U.S. to bind M + W Products or M + W Group.

The remaining evidence raised in the SAC does not provide any additional support for One Source's apparent authority theory.  Other than Exhibit Q, all of the emails and communications generated by the German entities are addressed to M + W U.S., and thus do not constitute conduct communicated to or manifested to One Source.  *See Jurimex Kommerz Transit*, 2006 WL 1995128, at *4 (finding that internal communications between parent and subsidiary cannot demonstrate apparent authority).  Furthermore, the communications that *are* manifested toward One Source are all from M + W U.S., and thus are not conduct on the part of the principal as necessary to create apparent authority — the actions of the alleged agent (here, M + W U.S.) cannot form the basis for apparent authority.  *See id.* (finding that actions and words of subsidiaries cannot create apparent authority).  One Source also provides communications indicating that it believed that it had contracted directly with M + W Group; again, this is not evidence of conduct on the part of the principal as is necessary to create apparent authority. Finally, many of the communications provided date long after the 2004 Agreement, and therefore cannot form the basis for One Source's belief that M + W U.S. had apparent authority to bind

the German Defendants at the time it promulgated the 2004
Agreement.

Plaintiff's attempts to further support its apparent
authority theory by pointing out the shared email address,
letterhead, and logo are equally unavailing, as "merely
displaying a tradename or logo does not, in and of itself, cloak
an agent with apparent authority." *Drown v. Granite Importers,
Inc.*, 2004 WL 5582197, at *2 (Vt. June 1, 2004); *see also
Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1461-62 (2d Cir. 1995)
("The presence of a parent's logo on documents created and
distributed by a subsidiary, standing alone, does not confer
authority upon the subsidiary to act as an agent.") (applying
New York law).

Finally, the Agreement itself does not provide sufficient
support for One Source's apparent authority argument.  The
Agreement was titled "M + W Zander Manufacturer's Representative
Agreement" and that the only manufacturer of products was
located in Germany, thereby implying that the German entities
were party to the contract.  They also point to the references
in the Agreement to devices "bearing the Company trademark" and
note that M + W Group was the only trademark-owning entity,
arguing that this made it reasonable for One Source to believe
that M + W Group was a party to the Agreement.  However, the
U.S. subsidiary is specifically identified as the signatory to

27

the contract, which One Source concedes in its SAC.  SAC ¶ 95
(One Source and M + W U.S. entered into the Agreement).
Moreover, the SAC notes that, in practice, M + W U.S. was the
entity that paid One Source its commissions under the Agreement.
SAC ¶ 52.  Thus, the SAC does not provide enough facts to
support a plausible inference that M + W U.S. had apparent
authority to bind M + W Group and M + W Products, and the breach
of contract and implied covenant of good faith and fair dealing
claims against them (Counts V and VI) must be dismissed.[10]

   This is a determination of who may be liable to satisfy a
*judgment*[11] for failure to pay the commissions due under the
Agreement; the Court's ruling on this issue has no bearing on
how these commissions should be calculated.  The fact that the
nonsignatory defendants are not bound by the contract does not
prevent One Source from arguing that it is nonetheless entitled
to commissions based on the sales and installations of all M + W
Group products.  Indeed, Plaintiff's evidence on the apparent
authority point — such as the references in the Agreement to the
Company trademark and manufacturer — are better suited to this
argument, rather than to the question of who is liable to

---

[10] These contract-based claims are dismissed without prejudice; if One
Source later uncovers evidence of acts of the principal that warrant a
finding of apparent authority, it may seek to amend the complaint once
again.

[11] M + W U.S. has indicated that it can satisfy a judgment in this
action.

satisfy a judgment.  Thus, while Plaintiff has provided no
evidence to offset the plain language of the contract indicating
that M + W U.S. is the entity that would have to satisfy a
judgment in the event of a breach, this ruling does not preclude
Plaintiff from arguing that it is entitled to commissions based
on sales of all M + W Group products.

**B. Total Facility Solutions, Inc. (Counts III and IV)**

The SAC also includes claims for breach of contract and
breach of an implied covenant of good faith and fair dealing
against TFS, another subsidiary of M + W Group.  Defendants
argue that these claims should be dismissed because TFS was not
a party to the contract and therefore cannot be liable.
According to the complaint, at the time Plaintiff entered into
the Agreement, M + W U.S. performed or subcontracted the type of
work now performed by TFS, and TFS was understood at the time to
be a branch of M + W U.S.  It cites the fact that TFS shared a
letterhead, email address, corporate address, and corporate
officers to argue that TFS is the successor to the branch of M+W
U.S. that had undertaken that sort of work.  However, the
contract was not transferable or assignable, and the SAC
provides no facts indicating that TFS is liable under the
contract as a successor to M + W U.S.  One Source also provides
no facts to indicate that M + W U.S. had apparent authority to
bind TFS.  Again, while the facts as alleged may support a

29

finding that Plaintiff is entitled to commissions on TFS's
projects within the territory, these same facts do not support a
finding that TFS is liable to satisfy a judgment under the 2004
Agreement.  The breach of contract and implied covenant claims
against TFS (Counts III and IV) are therefore dismissed.

## VI.  Tortious Interference (Counts VII and VIII)

Plaintiff also brings two counts of tortious interference
against M + W Group and M + W Products: one for tortious
interference (Count VII) and one for tortious interference with
prospective business (Count VIII).  One Source claims that the
German Defendants tortiously interfered with the Agreement by
selling products directly into the Sales Territory without
notice to or involvement of Plaintiff.  In the alternative,
Plaintiff argues that the German Defendants tortiously
interfered with the Agreement by improperly procuring its
termination.  SAC ¶ 177.  Plaintiff reasserts these claims in
Count VIII, its claim for tortious interference with prospective
business, with the added allegation that Defendants continued to
work with IBM Essex Junction after terminating the Agreement,
and argues that this constitutes tortious interference with
prospective business relations and unfair competition.  ¶¶ 199-
200.

To establish liability for tortious interference with
contract under Count VII, One Source must show that M + W

Products and M + W Group intentionally and improperly induced M + W U.S. not to perform its contract. *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 473 (Vt. 1996) (entry order); *accord Howard Opera House Assoc. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 930 (D. Vt. 2001) ("Because not every act that disturbs a contract is actionable the act of interference must be wrongful or improper beyond the fact of interference itself.") (internal quotations and alterations omitted).

One Source's first argument underlying the tortious interference claim rests on M + W's direct sales into the Territory.  These allegations do not support a finding of tortious interference because they do not constitute wrongful activity under the Agreement.  Direct sales of products into the Territory were not actually proscribed by the contract; thus, the sales themselves are not even a breach of the Agreement, much less tortious.  If anything, the purported direct sales would be in Plaintiff's best interest and in furtherance of the Agreement, as they would result in more commissions for Plaintiff.  *See* June 12, 2013 Hrg. Tr. At 59:3-6 (The Court: "[Defendants] are basically suggesting that the selling of the product is not interference; it in fact is consistent with the contract itself.").  There was no requirement in the Agreement that Defendants give Plaintiffs notice of sales leads.  Furthermore, "competitive business practices are not tortious,"

31

*Gifford*, 686 A.2d at 475 (citing Restatement (Second) of Torts § 768 (1979), and the Agreement clearly contemplated that M + W U.S. would continue to pursue sales opportunities in the Territory without One Source's involvement (as evidenced by the Destination Credit clause in the Agreement).  The wrongful activity, if any, was Defendants' failure to pay One Source a commission on the direct sales.  However, the SAC does not allege that M + W Group *directed* M + W U.S. not to pay such commissions.  Thus, the tortious interference claims cannot be sustained on the basis of the direct sales.

However, the Court does not dismiss the tortious interference claim altogether because it can be sustained, at least at the Rule 12 stage, by an alternate theory: that M + W Germany tortiously interfered with the contract by directing M + W U.S. to terminate the Agreement in bad faith.  Plaintiff rests this argument on the fact that M + W U.S. terminated the Agreement only after One Source corresponded with M + W Products about the commissions due under the Agreement, and that this makes it "apparent that Plaintiff was terminated as Defendants' Manufacturer's Representative for the sole reason that Plaintiff had the temerity to ask that the Defendants honor the Agreement," and that this evidences a bad faith decision on the part of the German Defendants.  SAC ¶ 181.  This creates a

plausible inference that the German Defendants played a role in
the termination of the Agreement.

Plaintiff also brings a second claim for tortious
interference with prospective business under Count VIII.  To
prevail on this claim, One Source must show that M + W Products
and M + W Group interfered with business relations existing
between One Source and a third party, either with the sole
purpose of harming One Source or by means that are dishonest,
unfair, or improper.  *Gifford*, 686 A.2d at 474-75.  This
requires a showing of "(1) the existence of a valid business
relationship or expectancy; (2) knowledge by the interferer of
the relationship or expectancy; (3) an intentional act of
interference on the part of the interferer; (4) damage to the
party whose relationship or expectancy was disrupted; and (5)
proof that the interference caused the harm sustained."   *J.A.
Morrissey, Inc. v. Smejkal*, 2010 VT 66, 188 Vt. 245, 255, 6 A.3d
701, 708-09 (2010).

In support of this count, One Source claims that the German
Defendants tortiously interfered with its prospective business
with IBM Essex Junction based on the fact that the German
Defendants continued to work directly with IBM Essex Junction
after the termination of the Agreement.  Plaintiff states that
it had set up a proposal with IBM Essex Junction and Defendants,
and that after the Agreement was terminated, Defendants refused

to work with Plaintiff and continued working on the project with
IBM Essex Junction, depriving Plaintiff of its business
expectancy of revenue from the project.  SAC ¶¶ 198-202.  Thus,
Plaintiff states in the SAC that it had a business relationship
with IBM Essex Junction and that the German Defendants knew
about this relationship.  They also have pled sufficient factual
allegations to support a plausible inference that the German
Defendants terminated the contract in order to interfere with
One Source's business relationship with IBM Essex Junction, and
that this interference caused damage to Plaintiff.  Thus,
Plaintiff has pled sufficient facts to meet the *Iqbal*/*Bell
Atlantic* plausibility standard as to Counts VII and VIII.

Defendants argue in their motion to dismiss that both
tortious interference claims should be dismissed because a
parent company cannot interfere with its subsidiary's contracts
or business relations as a matter of law.  *See Boulevard Assocs.
v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1037 (2d Cir. 1995)
(applying Connecticut law to conclude that a parent corporation
did not improperly induce its subsidiary to breach a contract).
In *Boulevard Assocs.*, the Second Circuit noted that "[c]ourts in
other states have uniformly found that a parent company does not
engage in tortious conduct when it directs its wholly-owned
subsidiary to breach a contract that is no longer in the
subsidiary's economic interest to perform."  *Id.* at 1036 & n.3

34

(citing cases).  While this might ultimately preclude judgment

for Plaintiffs on its tortious interference claims, these are

affirmative defenses that do not support dismissal at this

juncture.  *Payne v. Rozendaal*, 520 A.2d 586, 590 (Vt. 1986)

(finding that "any justification for intentional interference

with a person's contractual relation with another must be set

forth and proved by the defendant as an affirmative defense").

Defendants' motion to dismiss Plaintiff's tortious interference

claims against the German Defendants is therefore denied.

**VII. Punitive Damages (Count IX)**

     Defendants also seek to dismiss Plaintiff's claim for

punitive damages on the grounds that punitive damages are

generally not available in breach of contract actions.  *Murphy

v. Stowe Club Highlands,* 761 A.2d 688, 696 (Vt. 2000).  The

Vermont Supreme Court has recognized an exception to this rule

where "the breach has the character of a willful and wanton or

fraudulent tort, and when the evidence indicates that the

breaching party acted with actual malice."  *Monahan*, 2005 VT ¶

893 A.2d at 315-16.  Actual malice may be shown by "conduct

manifesting personal ill will, evidencing insult or oppression,

or showing a reckless or wanton disregard of plaintiff's

rights."  *Id.*

     Here, the Court is not persuaded that One Source's claim

for punitive damages should be dismissed at Rule 12 for multiple

reasons.  Plaintiff has provided facts to support at least a plausible inference that Defendants' breach manifested personal ill will such to support a claim for punitive damages. Plaintiff argues that Defendants wantonly breached the contract by only keeping One Source "in the loop" when it was useful to them and cutting them out where it was not.  SAC ¶ 62.  They argue that this was a result of personal ill will as evidenced by an email from Bill Spain to Rick Grauke stating that "Ralf [Graeber] doesn't like [Jimmo] for multiple reasons.  He is good for us in Burlington, but not necessarily elsewhere . . ."  ¶ 63.  They also state that Defendants terminated the contract only after Plaintiff requested that Defendants honor the terms of the Agreement, which they argue supports an inference of bad faith.  Thus, One Source's claim for punitive damages on its breach of contract claims is not dismissed at this juncture.

Furthermore, the SAC is not purely a breach of contract action, as it includes two claims of tortious interference and a claim under an implied covenant of good faith and fair dealing, which has been described as a tort under Vermont law.  *See* *Monahan*, 2005 VT 110, ¶ 54 n.5 (explaining that the cause of action for breach of the implied covenant of good faith and fair dealing "is one sounding in tort").  Plaintiff may proceed with its punitive damages claim under all of the surviving counts.

**VIII.    Personal Jurisdiction**

Defendants' final argument in its motion to dismiss —
thinly made — is that the Court lacks personal jurisdiction over
the German Defendants.  One Source bears the burden of showing
that the Court has personal jurisdiction over Defendants to
survive a motion to dismiss under Fed. R. Civ. P. 12(b)(2).
*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566
(2d Cir. 1996).  To meet this burden, One Source must plead
facts sufficient to support a finding that personal jurisdiction
is proper under Vermont's long-arm statute and the Due Process
Clause of the Fifth and Fourteenth Amendments.  Vermont's long-
arm statute extends personal jurisdiction to the outer limits
permitted by the federal Due Process Clause.  Vt. Stat. Ann.
tit. 12, § 913(b); *N. Aircraft, Inc. v. Reed*, 572 A.2d 1382,
1385-86 (1990).  The Due Process Clause requires that a
defendant "purposefully establishes minimum contacts within the
forum State . . . 'such that he should reasonably anticipate
being haled into court there.'"  *Burger King Corp. v. Rudzewicz*,
471 U.S. 462, 476 (1985) (quoting *World-Wide Volkswagen Corp. v.
Woodson*, 444 U.S. 286, 297 (1980)).  Once such "minimum
contacts" are determined, the Court must decide whether the
exercise of personal jurisdiction is reasonable and acceptable
under the traditional notions of fair play and substantial
justice.  *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano
County*, 480 U.S. 102, 113 (1987).

There are two types of personal jurisdiction: general and specific.  General jurisdiction is based on a "defendant's general business contacts with the forum state and permits a court to exercise its power where the subject matter of the suit is unrelated to those contacts." *Metro. Life. Ins. Co.*, 84 F.3d at 568.  Specific jurisdiction exists where the claims arise out of the contacts with the forum state, and is satisfied where "a defendant purposefully directs his or her activities towards residents of the forum State and the litigation that results arises from those activities." *Reed*, 574 A.2d at 1386.

The remaining claims against M + W Products and M + W Group are for tortious interference.  As these claims arise out of the German Defendants' activities in the forum state, the Court need only find specific jurisdiction over the German Defendants.  The SAC provides sufficient evidence that the German Defendants purposefully directed their activities toward Vermont: for example, One Source alleges that the German Defendants caused the Agreement to be terminated, then directly sold and installed software to IBM Essex Junction, thereby interfering with Plaintiff's reasonable business expectancy of revenue in Vermont.  SAC ¶¶ 200-01.  Not only did this constitute business activity directed toward Vermont, but the harm resulting from this interference was predictably experienced here.  This is sufficient to support a finding of specific personal

jurisdiction over the German Defendants with respect to the tortious interference claims, and Defendants' motion to dismiss for lack of personal jurisdiction is denied.

## CONCLUSION

The Court **grants in part and denies in part** Defendants' motion to dismiss.  The Court denies the motion to dismiss for lack of standing and for lack of personal jurisdiction, but grants the motion to dismiss for failure to state a claim as to Counts III-VI; these claims are **dismissed without prejudice**. The Court also denies Defendants' motion for partial summary judgment.

Dated at Burlington, in the District of Vermont, this 4th day of April, 2014.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge