UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

:
ONE SOURCE ENVIRONMENTAL, LLC,    :
                                  :
                    Plaintiff,    :
                                  :         Case No. 2:12-cv-145
          v.                      :
                                  :
M + W ZANDER, INC., M + W U.S.,   :
INC., M + W GROUP GMBH, M + W     :
PRODUCTS GMBH, AND TOTAL          :
FACILITY SOLUTIONS, INC.,         :
                                  :
                    Defendants.   :
                                  :

## Opinion and Order

Plaintiff One Source Environmental, LLC ("One Source") has
filed suit against Defendants M + W Zander, Inc.; M + W U.S.,
Inc. ("M + W U.S."); M + W Group GmbH ("M + W Group"); M + W
Products GmbH ("M + W Products"); and Total Facility Solutions,
Inc.  One Source is a Vermont-based limited liability company
involved in the sale and servicing of advanced clean room
technology.[1]  M + W Group, which owns M + W U.S., M + W Products,
and Total Facility Solutions, is a German business entity that
manufactures clean room components and devices.  The suit arises

---

[1] A clean room is an environment, typically used in manufacturing or
scientific research, with a controlled level of environmental pollutants.

out of a 2004 Manufacturer's Representative Agreement

("Agreement") between One Source and M + W Zander, Inc.[2]

One Source has amended its complaint on three separate
occasions.  In its Third Amended Complaint ("TAC"), filed on
November 20, 2014, One Source asserts 13 different claims for
relief.  Specifically, it alleges breach of contract and breach
of the implied covenant of good faith and fair dealing against
all defendants; tortious interference and tortious interference
with prospective business relationship/unfair competition
against M + W Group and M + W Products; and negligent and
intentional misrepresentation, as well as violations of the
Lanham Act and the Vermont Consumer Protection Act against M + W
Group, M + W U.S., and M + W Products.  The TAC also seeks
punitive damages.

Now before the Court are Defendants' motion for summary
judgment and One Source's motion to strike Defendants' statement
of undisputed material facts.  For the reasons stated below, One
Source's motion to strike is **denied**, and Defendants' motion for
summary judgment is **granted in part and denied in part**.

---

[2] At the time the Agreement was signed, M + W U.S. was known as M + W Zander,
Inc.  Because both sides agree that the name was changed, M + W Zander, Inc.
has been removed as a party to this action.

**BACKGROUND**

On January 16, 2004, One Source and M + W U.S. entered into a Manufacturer's Representative Agreement.[3]  Pursuant to the Agreement, One Source became the exclusive sales representative for the "Territory" encompassing New England, Quebec, and the State of New York (excluding New York City, which was defined as a "shared territory").  ECF No. 310-4 at 3.  As representative, One Source agreed to "endeavor to promote and extend the sale of Clean Rooms, Components, and Clean Air devices bearing The Company trademark" to customers within the Territory.  ECF No. 310-4 at 3.  One Source also agreed to adhere to broad confidentiality and non-competition obligations.  ECF No. 310-4 at 7.  In exchange, the Agreement provided that One Source would receive a commission on the sale of M + W products within the Territory.  ECF No. 310-4 at 5.  The Agreement did not provide a termination date.  Rather, it gave both parties the right to cancel at any time upon 30 days' notice.  ECF No. 310-4 at 3.

In 2010, One Source discovered that it was not receiving commissions on all of M + W's work in the Territory.  In response to its discovery, One Source emailed M + W Products, indicating that it believed it was entitled to a commission on a

---

[3] As this Court has explained previously, the Agreement was actually entered into by One Source Environmental Testing Services ("OSETS") and M + W Zander, Inc.  Since signing the Agreement, however, both parties have undergone changes in structure and nomenclature.  M + W U.S. is the successor entity to M + W Zander, Inc., and One Source is the successor in interest to OSETS.  *See* ECF No. 162.

particular project.  ECF No. 310-5.  Several months later, on
April 14, 2011, M + W U.S. sent One Source a letter terminating
the 2004 Agreement.  ECF No. 310-52.

On May 23, 2011, One Source served Defendants with a
complaint that it had filed in state court.  ECF No. 8.
Defendants removed the case to this Court in June 2012, and One
Source subsequently amended its complaint on November 20, 2012
and again on July 15, 2013.  The Second Amended Complaint
("SAC") alleged nine counts, including breach of contract and
breach of the implied covenant of good faith and fair dealing
against all parties; and tortious interference and tortious
interference with prospective business relationship/unfair
competition against M + W Group and M + W Products.  The SAC
also sought punitive damages.

Defendants filed a motion to dismiss the SAC and for
partial summary judgment on October 31, 2013.  In support of
their motion, Defendants argued that One Source lacked standing,
that the Court lacked personal jurisdiction over M + W Group and
M + W Products, and that One Source failed to state a claim
under FRCP 12(b)(6).  On April 4, 2014, this Court issued an
order denying partial summary judgment, and granting in part and
denying in part Defendants' motion to dismiss.  The Court denied
the motion to dismiss for lack of standing and for lack of
personal jurisdiction, but granted the motion to dismiss for

4

failure to state a claim with regard to the breach of contract and implied covenant claims against M + W Group, M + W Products, and Total Facility Solutions, Inc. (Counts III-VI).  The Court reasoned that because M + W Group, M + W Products, and Total Facility Solutions, Inc. were not parties to the 2004 Agreement, and because M + W U.S. did not have apparent authority to bind them in contract, those parties could not be held liable for a breach of the Agreement.

After engaging in further discovery, One Source filed a Third Amended Complaint on November 20, 2014.  The TAC includes all of the claims set forth in the SAC and adds four additional counts against M + W U.S., M + W Group, and M + W Products for violation of the Lanham Act, violation of Vermont's Consumer Protection Act, negligent misrepresentation, and intentional misrepresentation.  The added counts arise out of One Source's discovery of unauthorized UL marks on 18 filter fan units it purchased from Defendants in 2004.

On August 15, 2015, Defendants filed the pending motion for summary judgment.  Because this Court has already dismissed the claims asserted in Counts III-VI of the TAC,[4] Defendants' motion

---

[4] As stated above, on April 4, 2014, this Court dismissed without prejudice Counts III-VI of the Second Amended Complaint.  ECF No. 162 at 39.  Counts III-VI of the Third Amended Complaint are identical to those counts of the SAC that the Court dismissed.  Because Counts III-VI were previously dismissed, and because One Source offers no explanation as to why the identical claims are now viable, the Court dismisses those claims without discussion.

requests that the Court enter summary judgment in Defendants'
favor on all remaining claims (Counts I, II, and VII-XIII).  One
Source filed its motion to strike the statement of undisputed
material facts on September 17, 2015.

### DISCUSSION

### I. Motion to Strike

The Court begins by addressing One Source's motion to
strike Defendants' statement of undisputed material facts
("SUMF").  As required by Local Rule 56(a), Defendants filed a
SUMF in support of their motion for summary judgment.  One
Source contends that the SUMF is improper because it is
insufficiently concise, thereby imposing an unnecessary burden
on One Source and this Court.

Local Rule 56(a) provides that a motion for summary
judgment "must be accompanied by a separate and concise
statement of undisputed material facts."  Here, prior to filing
their motion for summary judgment, Defendants requested leave
from the Court to submit a 50 page memorandum in support of
their motion.  ECF No. 307.  One Source assented to Defendants'
request, which was granted by the Court.  *Id.*  Additionally, One
Source's Third Amended Complaint sets forth 13 claims for
relief, and discovery in this case has been extensive.  Thus,
although Defendants' SUMF is undeniably lengthy, this Court does

not view its length as inappropriate.  The motion to strike is **denied.**

## II.  Motion for Summary Judgment

### A. Legal Standard

The Court next turns to Defendants' motion for summary judgment.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, when ruling on a motion for summary judgment, courts must examine the evidence in the light most favorable to the nonmoving party, *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

### B. Breach of Contract against M + W U.S. (Count I)

Defendants first move for summary judgment on One Source's claim that M + W U.S. breached the 2004 Agreement by failing to

pay One Source duly-owed commissions.  Under Delaware law,[5]
courts engaged in contract interpretation are to "give priority
to the parties' intentions as reflected in the four corners of
the agreement."  *GMC Capital Invs., LLC v. Athenian Venture
Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (internal
citation omitted).  To do so, courts "must construe the
agreement as a whole, giving effect to all provisions therein."
*Id.*  "The meaning inferred from a particular provision cannot
control the meaning of the entire agreement if such an inference
conflicts with the agreement's overall scheme or plan."  *Id.*

In analyzing a contract, courts are to "interpret clear and
unambiguous terms according to their ordinary meaning," and
"[c]ontract terms themselves will be controlling when they
establish the parties' common meaning so that a reasonable
person in the position of either party would have no
expectations inconsistent with the contract language."  *Id.* at
780 (internal quotation omitted).  A simple disagreement between
the parties as to the proper construction of a contract will not
render the contract ambiguous.  *Id.*  "Rather, an ambiguity
exists when the provisions in controversy are fairly susceptible
of different interpretations or may have two or more different
meanings."  *Id.* (internal quotation omitted).

---

[5] As the Court has previously recognized, the 2004 Agreement includes a choice of law provision providing that the "Agreement shall be governed by the laws of Delaware."  ECF No. 310-4 at 8.

"If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Where reasonable minds could differ as to the contract's meaning, however, "a factual dispute results and the fact-finder must consider admissible extrinsic evidence." *GMC Capital Invs., LLC*, 36 A.3d at 783. Ultimately, "in a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation." *Id.* at 784.

As an initial matter, Defendants do not dispute that they engaged in projects and sold products in the Territory during the time period in which the Agreement was in effect without providing a commission to One Source. *See, e.g.*, ECF No. 310-19 (providing Defendants' Products Sales Chart, which details projects in which One Source was not involved and did not receive a commission). Rather, Defendants contend that M + W U.S.'s failure to provide One Source with a commission on those transactions did not violate the Agreement because the Agreement unambiguously required One Source to be involved in a sale in order to earn a commission. In the alternative, Defendants submit that even if One Source can establish that it is entitled

to a commission on sales in which it was not involved, the commission due should be based not on the entire cost of work for a given project, but on the sale price of components marketed by M + W U.S.  To address those alternative theories, the Court considers separately the questions of (1) whether the Agreement required One Source to play a role in a sale in order to earn a commission; and (2) whether, to the extent One Source is entitled to a commission on sales in which it was not involved, the commission is limited to a percentage of the sale price of components sold by M + W U.S.

**1. One Source's Involvement in a Sale**

Defendants rely upon the Commissions provision of the 2004 Agreement to argue that the Agreement unambiguously required that One Source be involved in a sale to earn a commission. Specifically, Defendants focus on the portion of the provision that states, "The Company agrees to pay, and The Representative agrees to accept as full remuneration for his services and expenses, the commissions on all products, which are *sold by The Representative* within the assigned territory...."  ECF No. 310-4 at 5 (emphasis added).  That language, Defendants contend, unambiguously provides that One Source must play a role in a sale in order to receive a commission.  Because the parties agree that One Source was not involved in the transactions at issue, Defendants submit that summary judgment is appropriate.

Defendants' argument cannot succeed.  In addition to the clause cited by Defendants, the Commissions provision also contains a Destination Credit clause.  The latter clause provides that "[w]hen goods are specified and/or purchased in one Representative territory for delivery into another, the commission shall be divided" and a "'DESTINATION' credit of ten percent (10%) shall be given to the Representative into whose territory the equipment is shipped."  ECF No. 310-4 at 5-6. Thus, a reading of the Agreement demonstrates that the plain language of the "Commissions" provision is self-contradictory. On one hand, the provision states that One Source is entitled to commissions on only those products "sold by the Representative within the assigned territory."  ECF No. 310-4 at 5.  Yet on the other, the Destination Credit clause implies that One Source is to receive 10% of the commission on a product shipped into the Territory regardless of its involvement in the sale.  Because reasonable minds could differ as to how to construe those contradictory clauses, the Agreement itself is ambiguous with regard to whether One Source must be involved in a sale in order to earn a commission.

Given the ambiguity in the text of the Agreement, the Court next looks to whether Defendants have offered uncontested evidence that their interpretation of the contract is proper. An examination of the record reveals that Defendants have failed

to do so.  First, Defendants' own Ralf Graeber, executive vice president of M + W U.S., stated in his deposition that "[i]f [One Source] was in compliance with the agreement, [it] could have been entitled to receive a relatively small 'destination credit' for sales of components into the 'Territory' covered by the 2004 Agreement, even if [One Source] had no role in obtaining the sale."  ECF No. 310-11 at 7.  That testimony alone is sufficient to raise a question of material fact as to whether One Source should receive a destination credit absent any involvement in a sale.

Second, beyond a claim for the destination credit, record evidence also creates a genuine dispute of material fact as to whether One Source is entitled to a full commission on sales in which it was uninvolved.  The "Territory" provision of the 2004 Agreement provides that:

> The Company hereby assigns to The Representative as its area of responsibility the territory of Quebec, Canada, New England to include the States of Maine, New Hampshire, Vermont, Massachusetts, Connecticut, and Rhode Island, and also the state of New York.  New York City is not an exclusive assignment, but is a shared territory.

ECF No. 310-4 at 3.  When viewed in the light most favorable to One Source, the fact that the Agreement specifies that New York City is not an exclusive assignment indicates that the remaining parts of the Territory are, in fact, exclusive assignments.

12

That conclusion is further supported by several other facts in the record.  To begin, One Source and M + W U.S. (then M + W Zander) first entered into a Manufacturer's Representative Agreement in 2003.  Under the 2003 Agreement, M + W U.S. sought the authority to make direct sales within the Territory by placing a sentence in the draft agreement providing that "[s]ubject to the payment of commissions is provided hereafter in Paragraphs 8 and 9, The Company reserves the right to make direct sales in the territory listed herein, when, in its judgment, such action is necessary." *See* ECF No. 316-2 at 1. One Source opposed such authority, however, and M + W eventually agreed to omit the sentence.  Moreover, in the 2004 Agreement, which was also silent as to M + W U.S.'s general authority to sell products into the Territory, the parties specifically agreed that Defendants retained exclusive authority to make sales to the State University of New York ("SUNY") on two particular projects.  ECF No. 310-4 at 3.  Those two facts, when considered alongside both the non-competition provision, ECF No. 310-4 at 7 (prohibiting One Source from directly or indirectly competing with M + W U.S.), and industry custom, *see* ECF No. 316-8 at 87-88, further confirm that a reasonable jury could conclude that One Source was exclusively responsible for all sales within the Territory.  Extrapolating from that conclusion, a reasonable jury could also find that M + W U.S. was not

13

authorized to make direct sales into the Territory outside of those related to the two specified SUNY projects, and that One Source was entitled to full commissions on all sales made in the Territory regardless of its involvement in a given transaction.

Thus, drawing all inferences in favor of One Source, record evidence supports at least two theories that conflict with Defendants' interpretation of the 2004 Agreement: (1) that One Source was entitled to a commission pursuant to the Destination Credit clause on sales in which it was uninvolved; and (2) that One Source, as the exclusive representative for the Territory, was entitled to a full commission on all sales made in the Territory irrespective of its involvement in any given sale. Accordingly, the Court **denies** Defendants' motion for summary judgment with respect to Defendants' theory that the Agreement required One Source to play a role in a sale in order to earn a commission.

### 2. The Basis of the Commission

Defendants argue in the alternative that even if One Source can demonstrate that it is owed a commission on sales in which it was uninvolved, the amount of that commission is, "at the very most, a destination credit of 10% of the total commission on the M + W components sold." ECF No. 310-1 at 9. In support of their position, Defendants first point to the text of the Agreement, again arguing that the relevant contractual

14

provisions are unambiguous.  They specifically cite the
Destination Credit clause, which provides that a "DESTINATION
credit of ten percent (10%) shall be given to The Representative
into whose territory the equipment is shipped," ECF No. 310-4 at
6, and the first paragraph of the Commissions provision ("the
Commissions Limitation clause"), which states that "[c]ommission
shall be based upon the quoted total U.S. dollar value of an
accepted order and apply only to components marketed by The
Company.  Subcontracts, buyouts, taxes, rigging cost, freight,
supervision, testing, etc., shall be deducted from the gross
amount of an accepted order before applying the schedule of
commissions."  ECF No. 310-4 at 5.  Based on those two
provisions, Defendants assert that the Agreement unequivocally
specifies that, in cases where One Source's involvement was
based solely on its contractual territory, commissions are
limited to 10% of the sale price of M + W components.

    Defendants next submit that, even if the Court finds the
Agreement to be ambiguous, summary judgment remains appropriate
because they have offered uncontested evidence that their
interpretation of the contract is correct.  With respect to the
Destination Credit clause, Defendants note that One Source has
provided no evidence indicating that the parties ever
interpreted that provision of the contract.  Consequently,
Defendants claim, there is no extrinsic evidence that conflicts

15

with their reading of that clause.  As to the Components Limitation clause, Defendants argue that the record establishes that the parties shared a common understanding of the term "components."  Their argument rests largely on a January 19, 2011 email from Jeffrey Jimmo, president and owner of One Source, to Markus Huegle at M + W Products, in which Mr. Jimmo requests commission "based on FFUs, Ceiling Grid and Mechanical Equipment that was purchased as part of the [Global Foundries] project and shipped into the territory."  ECF No. 310-5.  That email, Defendants assert, provides clear evidence that One Source agreed with M + W's interpretation of the provision at issue.  In addition, Defendants submit that One Source has failed to present any evidence demonstrating that it has received a commission based on the entire cost of work of a project in which it was uninvolved.  Thus, given the lack of extrinsic evidence regarding the parties' interpretation of the Destination Credit clause, Mr. Jimmo's demonstrated understanding of the term "components," and One Source's failure to provide any evidence supporting its "total cost of work" theory, Defendants argue that their reading of the contract is indisputably correct.  Accordingly, Defendants assert that they are entitled to judgment as a matter of law on their alternative theory of damages.

Construing the Agreement as a whole, as the Court must,
both the Destination Credit clause and the Components Limitation
clause are patently ambiguous.  First, with regard to the
Destination Credit clause, it is unclear from the text of the
Agreement whether the credit applies to direct sales made by M +
W or whether it is limited to sales involving more than one
representative.  Subsection B of the Commissions provision
provides that "[w]hen goods are specified and/or purchased in
one Representative territory for delivery into another, the
commission shall be divided in a manner decided by The Company
in the proportions itemized below."  ECF No. 310-4 at 5.  The
subsection proceeds to identify four different credits that a
representative may receive in cases of split commissions.  ECF
No. 310-4 at 6 (including (1) the Specification Credit of 40%
for having the Company's products specified; (2) the Special
Effort Credit of 40% for being significantly responsible for the
order placed with the Company; (3) the Closing the Order Credit
of 10% for obtaining the purchase order; and (4) the Destination
Credit of 10% for being the representative into whose territory
the equipment is shipped).  Importantly, the description of each
credit begins by indicating that the credit "shall be" given or
awarded "to The Representative" who meets the specified
criteria.  ECF No. 310-4 at 6.  By contrast, nothing in the text
of the Agreement expressly indicates that, in cases of direct

17

sales made by the Company, M + W is entitled to retain a portion
of the commission.  Thus, the text of the Destination Credit
clause, when read as part of the entire Commissions provision,
could rationally be interpreted in one of two ways: (1) that it
limits the commission of a representative who is uninvolved in a
sale, but into whose territory the equipment is shipped, only in
cases where at least one other representative is involved in the
sale; or (2) that it limits the commission of a representative
who is uninvolved in a sale, but into whose territory the
equipment is shipped, regardless of whether the sale was made by
another representative or by the Company itself.  Because
reasonable minds could differ as to the proper interpretation,
the Destination Credit clause is ambiguous as to whether the 10%
cap applies to cases of direct sales made by Defendants.

Second, with respect to the Components Limitation clause,
the contractual language is similarly unclear, when read in the
context of the Agreement as a whole, as to what items are
commissionable under the contract.  Beyond the word
"components," used in the Components Limitation clause, ECF No.
310-4 at 5, the Agreement employs at least two additional terms
to describe those items that may be subject to a commission.  In
the third sentence of the Commissions provision, for example,
the Agreement indicates that the Representative agrees to accept
"commissions on all *products*."  *Id.* (emphasis added).  And in

18

the Destination Credit clause, the contract provides that the credit shall be given to the Representative "into whose territory the *equipment* is shipped." *Id.* (emphasis added). Thus, the text of the Agreement itself states that *components, products,* and *equipment* may all be commissionable. Yet nowhere in the Agreement do the parties define those terms. Given the contract's use of multiple, undefined terms to describe those items that are subject to a commission, reasonable minds could undoubtedly disagree as to the intent of the parties. The Agreement is therefore ambiguous with regard to what items are commissionable under the contract.

Due to the ambiguity in the text of the contract, the Court again looks to whether the evidence supporting Defendants' interpretation of the Agreement is uncontested in the record. The Court finds that it is not. Beginning with the Destination Credit clause, although Defendants accurately cite Mr. Jimmo's testimony that he did not believe One Source had ever received a destination credit for any sale, ECF No. 310-12 at 71, evidence of prior dealings is not the only evidence relevant to the proper construction of the contract. In his expert report, Glen Balzer writes that Subsection B of the Commissions provision is an example of what the manufacturer representative industry refers to as a "split commission" provision. Such provisions, Mr. Balzer explains, are used to motivate manufacturer's

representatives when there are two or more representatives involved in a single sale.  Although different manufacturers may divide the commission shares differently, Mr. Balzer continues, "[i]t is a well-understood and accepted practice in the sales representative industry that manufacturers cannot claim any portion of the available commission on sales in a representative's territory."  ECF No. 316-9 at 9.  The parties in the present case agree that no other manufacturer's representatives were involved in the projects on which One Source now claims a commission.  Given that fact, and viewing the statement of Mr. Balzer in the light most favorable to One Source, a reasonable jury could find that the Destination Credit cap is inapplicable in the present case, where the sales at issue were made directly by M + W.  Accordingly, summary judgment on Defendants' interpretation of the Destination Credit clause is inappropriate.

    Next, with regard to the Components Limitation clause, One Source has again presented sufficient evidence to contest Defendants' interpretation of the Agreement.  Subsection A of the Commissions provision provides that "[f]or The Company published price sheet items, the commission shall be the difference between the 'Representative Cost' and the 'Suggested Sell Price.'"  ECF No. 310-4 at 5.  As acknowledged by M + W U.S. CEO Richard Whitney, however, Defendants never published

20

the aforementioned price sheets.  ECF No. 310-55 at 82.
Consequently, even accepting Defendants' argument that One
Source and M + W U.S. agreed on the meaning of the term
"components," it was impossible for the parties to follow the
strict letter of the Agreement in calculating the commissions to
which One Source was entitled.  It is One Source's contention
that, because the price sheets were never published, the parties
mutually interpreted the Agreement to provide that commissions
would be based on a flat percentage of the total cost of work on
cleanroom-related projects.

For the purposes of defeating a motion for summary
judgment, One Source's theory is adequately supported by the
affidavit of Marvin Joanis, the M + W U.S. employee who drafted
and negotiated the 2004 Agreement.  In his affidavit, Mr. Joanis
recognized the unavailability of the price sheets and stated
that "rather than calculate commissions as per the written
language in the 2004 Agreement, Mr. Jimmo and I agreed that One
Source's commissions would be calculated as a straight
percentage of M + W's work on a particular project."  ECF No.
316-7 at 4.  He continued to specify that, "[w]here products or
systems were turnkey products or systems assembled on-site in
the Territory...One Source received a commission based on the
*entire* cost of work...."  ECF No. 316-7 at 4.  Thus, despite the
explicit contractual language excluding "subcontracts, buyouts,

taxes, rigging costs, freight, supervision, testing, etc." from the schedule of commissions, Mr. Joanis's statements indicate that the parties disregarded that language and mutually agreed that the Agreement would provide for a flat commission based on the total cost of work.  The parties' course of dealing further supports such a conclusion.  *See* ECF No. 316-15 (email from M + W U.S. project manager Bill Spain to Mr. Jimmo indicating "[y]our commission is a part of the total proposed price to IBM...[One Source's] 3% is added to M + W's total cost of work (COW)...").  That evidence, when viewed in the light most favorable to One Source, is sufficient to raise a genuine dispute of material fact regarding the basis of commissions under the Agreement.[6]

---

[6] Given that the Court finds the Components Limitation clause of the Agreement to be ambiguous, the distinction between One Source's *interpretation* theory and its *modification* theory is primarily academic.  The Court notes, however, that One Source has presented sufficient evidence to proceed on its modification theory insofar as it claims that the parties orally agreed, due to the lack of published price sheets, that commissions would be calculated not as the difference between the "Representative Cost" and the "Suggested Sell Price", but as a "straight percentage of M + W's work on a particular project."  ECF No. 316-7 at 4.  Delaware law provides that "[a] party asserting an oral modification must prove the intended change with specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) (internal quotation omitted).  Although Mr. Joanis's affidavit does not suggest that the parties agreed to a particular commission percentage for all future projects, or that the parties addressed whether the Agreement required One Source to be involved in a sale in order to receive a commission, the affidavit does specifically and directly imply that commissions, whenever due, were to be calculated as a flat percentage of the total cost of work on a given project.  Moreover, if the parties did orally agree to such a modification, there would have been adequate consideration, as both parties relinquished their rights under the Agreement to collect or pay commissions based on the price sheets.

It bears mentioning that although a 3% commission on the total cost of work appears to be the most common form of commission utilized by the parties throughout their contractual relationship, *see* ECF No. 310-11 at 12-16, the parties do seem to have agreed to reduce the commission percentage on projects where One Source was only minimally involved, *see* ECF No. 316-12 at 2 (documenting the parties' agreement on a 1.5% commission for the IBM Annex Phase II project, in which One Source was responsible for only four or five site visits). That observation, as Defendants urge, may well suggest that when One Source was wholly uninvolved in a project, it was not entitled to any commission at all. As the record has revealed, however, such a question is one of fact, and it must be placed in the hands of a jury. Given the plainly ambiguous contractual language, the industry custom regarding split commission provisions, and Mr. Joanis's affidavit addressing the parties' mutual understanding of commission calculations, Defendants have failed to offer uncontested evidence that One Source is entitled to, at most, a destination credit of 10% of the total commission on the sale of M + W components. Accordingly, the Court **denies** Defendants' motion for summary judgment with respect to Count I of the TAC.

## C. Implied Covenant of Good Faith and Fair Dealing against M + W U.S. (Count II)

Defendants next move for summary judgment on One Source's claim that M + W U.S. breached the implied covenant of good faith and fair dealing by terminating the Agreement in response to One Source's request for duly-owed commissions.[7]  The implied covenant of good faith and fair dealing attaches to every contract governed by Delaware law.  *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).  Broadly, it "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Id.* (internal quotation omitted).

Defendants assert that summary judgment is appropriate because discovery has revealed no evidence indicating M + W U.S. terminated the Agreement in bad faith.  Rather, Defendants claim, the evidence unequivocally shows that M + W U.S. cancelled the Agreement only after One Source filed this action against Defendants.  In support of their position, Defendants cite the deposition testimony of Mr. Richard Whitney, president and CEO of M + W U.S., and Mr. Rick Grauke, product manager at M + W U.S.  Both Mr. Whitney and Mr. Grauke indicate that M + W

---

[7] In the TAC, One Source advances several other theories in support of its claim that M + W U.S. breached the implied covenant of good faith and fair dealing.  ECF No. 225 at 22-23.  Those alternative theories are not addressed here, however, as they were dismissed by the Court in its April 4, 2014 Order.  *See* ECF No. 162 at 19-22.

U.S. terminated the Agreement after learning about One Source's lawsuit.  ECF No. 310-55 at 71-72; ECF No. 310-56 at 41-42. Because terminating the Agreement in response to litigation does not constitute bad faith, Defendants argue that the Court should grant their motion for summary judgment.

Defendants' argument cannot succeed.  To begin, as the Court ruled in its April 4, 2014 Order, termination of an at-will contract, although permissible for no reason at all, may nonetheless violate the implied covenant of good faith and fair dealing if the decision to terminate is made in bad faith.  *See* ECF No. 162 at 21-22.  Here, although Defendants indicate that M + W U.S. cancelled the Agreement after learning of the present lawsuit, One Source has presented sufficient evidence to call that assertion into question.

As One Source notes, it originally filed its complaint in this matter in state court on February 22, 2011.  ECF No. 5.  It did not serve the complaint, however, until May 23, 2011.  ECF No. 8.  Under the Vermont Rules of Civil Procedure 77(e), complaints remain confidential until they are served on at least one defendant.  Thus, because its counsel did not contact Defendants until April 26, 2011, *see* ECF No. 310-6, One Source argues that Defendants could not have known about the complaint at the time M + W U.S. terminated the Agreement on April 14, 2011, ECF No. 310-52.  That observation, One Source contends,

cuts against Defendants' claim that M + W U.S. terminated the Agreement as a reaction to the present case, and leaves open its theory that M + W U.S terminated the Agreement to avoid paying One Source duly-owed commissions.

In response, Defendants argued during the November 9, 2015 motions hearing that the exact date on which One Source served its complaint is immaterial.  ECF No. 351 at 37-38.  Given Mr. Jimmo's January 19, 2011 email requesting additional commissions and his subsequent failure to respond to M + W U.S.'s telephone calls, Defendants asserted that even if M + W U.S. employees had yet to learn of any formal legal action, they may have reasonably surmised that One Source intended to bring suit.  ECF No. 351 at 38.  That theory, however, is belied by the testimony of M + W U.S. officials.  In his deposition, Mr. Whitney stated he "saw a filing and a narrative letter from I believe your firm, which indicated the nature of [Mr. Jimmo's] concern."  ECF No. 310-55 at 71-72.  Based on the communication from Mr. Jimmo's counsel, Mr. Whitney continued, he "told Ralf [Graeber] to terminate the agreement."  ECF No. 310-55 at 72.  Mr. Grauke provided similar testimony, indicating in his deposition that "Ralf [Graeber] called me up and he said that—that that [lawsuit] was under way, and he said, I'll be sending you a copy of it, but he said, let's—you know, let's go ahead and hold off doing any further business."  ECF No. 310-56 at 42.

Contrary to Defendants' proposed theory, the testimony of
Mr. Whitney and Mr. Grauke suggests not that they had merely
assumed that One Source would bring suit, but that they had
physically received both the demand letter and the complaint
prior to their decision to terminate the Agreement.  In light of
the timeline explained above, that testimony raises concerns
about the accuracy of Defendants' contention that M + W U.S.'s
decision to terminate the Agreement was based on the filing of
the case at bar.  That concern, coupled with the general timing
of the termination, creates a genuine dispute as to the reasons
why M + W U.S. terminated the Agreement, and whether M + W U.S.
exercised bad faith in its decision to do so.  Accordingly, the
Court **denies** Defendants' motion for summary judgment with
respect to Count II of the TAC**.**

### D. Tortious Interference Claims against M + W Group and M + W Products (Counts VII and VIII)

Defendants also move for summary judgment on both of One
Source's tortious interference claims.  In the TAC, One Source
alleges that M + W Group and M + W Products (together, "M + W
Germany") tortuously interfered with its contract with M + W
U.S. by directing M + W U.S. to terminate the Agreement in bad
faith (Count VII).[8]  In addition, One Source further asserts that

---

[8] The TAC also sets forth the theory that M + W Germany tortuously interfered
with the Agreement by making direct sales into the Territory.  This theory
was dismissed in the Court's Order dated April 4, 2014.  ECF No. 162 at 30-
35.

M + W Germany tortuously interfered with its prospective
business with IBM Essex Junction ("IBM") by continuing to work
with IBM after the termination of the Agreement (Count VIII).
One Source submits that it had set up a proposal with IBM and
Defendants, and that after the Agreement was terminated,
Defendants refused to work with One Source and continued to work
on the project with IBM, thereby depriving One Source of its
expected revenue from the project.  The Court considers each of
those counts in turn.

### 1. Tortious Interference (Count VII)

To establish liability for tortious interference with a
contract, a plaintiff must show that the defendant
"intentionally and improperly induced [a third party] not to
perform its contract."  *Gifford v. Sun Data, Inc.*, 686 A.2d 472,
473 (Vt. 1996).

Here, Defendants maintain that the evidence indisputably
shows that M + W Germany played no role in the termination of
the Agreement between One Source and M + W U.S.  Defendants
bolster their position with the deposition testimony of M + W
U.S. CEO Mr. Richard Whitney, who stated that he alone decided
to terminate the Agreement, ECF No. 310-55 at 73, and M + W
Products CEO Herbert Blaschitz, who provided that he did not
speak with anybody about terminating the Agreement, ECF No. 310-
62 at 244.  Defendants contend that because One Source has

failed to present sufficient evidence to the contrary, summary judgment is appropriate.

The Court agrees with Defendants' contention.  In support of its claim against M + W Products, One Source cites the facts that Mr. Blaschitz knew about One Source's request for commissions under the Agreement, and that he briefly discussed the issue with Mr. Whitney in person at an executive committee meeting in Germany.  *See* ECF No. 310-55 at 61-62.  One Source also notes that Mr. Blaschitz called Mr. Ralf Graeber, executive vice president of M + W U.S., and told him to address One Source's request for commissions.  ECF No. 310-15 at 189 [Graeber Depo.] ("[H]e just advised me that this is not his responsibility and that we need to take care of that.").  Finally, One Source points out that Mr. Blaschitz directed M + W Products to cease working with One Source until the commissions dispute was resolved.  ECF No. 310-62 at 216-18.

Even drawing all permissible inferences in favor of One Source, a reasonable jury could not conclude from the facts above that M + W Products induced M + W U.S. to terminate the Agreement with One Source.  Although the facts establish that Mr. Blaschitz communicated with employees of M + W U.S. about One Source's request for commissions, they in no way suggest that Mr. Blaschitz offered any guidance on whether M + W U.S. should terminate the parties' contractual relationship.  After

an adequate time for discovery, summary judgment is required
when "a party fails to make a showing sufficient to establish
the existence of an element essential to her case upon which she
has the burden of proof." *Doe v. Forrest*, 853 A.2d 48, 53 (Vt.
2004).  As plaintiff, it is ultimately One Source's burden to
establish each of the elements of its claim.  Because One Source
has failed to present any evidence indicating that M + W
Products induced M + W U.S. to terminate the Agreement, summary
judgment with respect to the claim against M + W Products is
appropriate.

　　　One Source also fails to make a sufficient showing of
inducement in its claim against M + W Group.  In support of its
position, One Source relies solely on the fact that M + W Group,
as the parent company, had the ability to control certain
decisions made by M + W U.S.  It provides no evidence that M + W
Group communicated with M + W U.S. about the Agreement, and it
provides no evidence that M + W Group even knew about the
commissions dispute.  Such a relationship between business
entities, without more, is insufficient to allow a reasonable
jury to infer that M + W Group directed M + W U.S. to terminate
the Agreement.  Accordingly, the Court **grants** Defendants' motion
for summary judgment with respect to Count VII of the TAC.

## 2. Tortious Interference with Prospective Business (Count VIII)

To prevail on a claim of tortious interference with prospective business, a plaintiff must establish five elements: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference on the part of the interferer; (4) damage to the party whose relationship or expectancy was disrupted; and (5) proof that the interference caused the harm sustained." *Gifford*, 686 A.2d at 474 n.2.  Additionally, the "plaintiff must prove that the defendant interfered with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper." *Id.* at 474-75.

Here, as stated above, One Source alleges that M + W Germany tortuously interfered with its prospective business with IBM. As evidence for its claim, One Source points to facts indicating that it had been in direct correspondence with M + W Products regarding a joint proposal for a software upgrade for IBM, and that after the Agreement was terminated, M + W Products refused to work with One Source and completed the upgrade for IBM, thereby depriving One Source of its expected revenue from the project.

As an initial matter, summary judgment is warranted with regard to One Source's claim against M + W Group because One Source has presented no evidence indicating that M + W Group took any action to interfere with its relationship with IBM. Instead, the evidence produced by One Source focuses entirely on M + W Products's decision to cease working with One Source once the Agreement was terminated.  Accordingly, One Source's claim against M + W Group cannot be sustained.

Moving next to One Source's claim against M + W Products, even viewing the facts above in the light most favorable to the non-movant, One Source has failed to present evidence sufficient to survive a motion for summary judgment.  First, the record does not establish that One Source had a valid business relationship or expectancy with IBM.  In the testimony relied upon by One Source, Mr. Jimmo provides only that he had worked on a quote with Markus Huegle that IBM had previously denied, and that "going forward we were going to try to quote this thing again."  ECF No. 310-13 at 158.  The parties agree that One Source and IBM had not entered into a contract for the software upgrade, and the testimony of Mr. Jimmo alone is too speculative to demonstrate a valid business relationship or expectancy. Second, One Source has not shown that M + W Products acted "either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper."  *Gifford*, 686

A.2d at 474-75.  To the contrary, the undisputed evidence establishes that M + W Products ceased working with One Source not because it intended One Source any harm, but because it was concerned about One Source's dispute with its affiliate M + W U.S.  ECF No. 310-62 at 220 [Blaschitz Depo.] (stating "I consider also, you know, the M + W as a family member in that regard, you know, from a company standpoint.  And that's why I said, look, as long as it's not clarified, we are not doing anything with them at the moment.").  That fact is further supported by an email from M + W Products to One Source in which M + W Products indicated that it is open to resuming a working relationship as soon as the dispute is resolved.  ECF No. 61 at 1.  Thus, because One Source has presented insufficient evidence that it had a valid business expectancy with IBM, and that M + W Products acted with the sole purpose of causing it harm or by means that were dishonest, unfair, or improper, a reasonable jury could not return a verdict in its favor on its claim of tortious interference with prospective business.  Accordingly, the Court **grants** Defendants' motion for summary judgment with respect to Count VIII of the TAC.

### E. UL-Related Claims against M + W Group, M + W Products, and M + W U.S. (Counts X – XIII)

Defendants next move for summary judgment with respect to all four of One Source's claims related to Defendants' use of

Underwriters Laboratories' ("UL") marks.[9]  One Source's UL-related claims arise out of a 2004 transaction in which One Source contracted with M + W U.S. for the sale of 18 filter fan units ("FFUs") manufactured by M + W Products.  One Source used the FFUs to manufacture ten mobile clean air units, five of which it has sold to customers.  One Source's purchase of the FFUs was contingent on UL certification, and according to One Source, M + W Products knowingly affixed unauthorized UL marks to each of the 18 units.  Upon discovering that the UL marks were not properly authorized, One Source amended its complaint to add counts of negligent and intentional misrepresentation, as well as violations of the Lanham Act and the Vermont Consumer Protection Act.

Initially, the Court **grants** summary judgment with respect to all four claims filed against M + W Group.  As Defendants note, One Source has presented no evidence that M + W Group played a role in the manufacture or sale of the FFUs at issue.  Rather, One Source alleges that M + W Products placed the UL marks on the relevant units, and that M + W U.S. entered into a contract with One Source for the sale of the units.  Summary judgment with respect to M + W Group is therefore appropriate.  The Court considers separately each of the four UL-related

---

[9] UL is an independent safety science company that, among other things, develops international safety standards, tests products, and certifies that products meet those safety standards after testing.

claims against remaining Defendants M + W Products and M + W
U.S.

**1. The Lanham Act (Count X)**

The Lanham Act's prohibition on false endorsement prohibits
persons from engaging in false or misleading practices likely to
"deceive as to the affiliation, connection, or association of
such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services, or
commercial activities by another person."  15 U.S.C. §
1125(a)(1).  As the Supreme Court recently clarified, in order
to obtain relief under the Act, "a plaintiff must plead (and
ultimately prove) an injury to a commercial interest in sales or
business reputation proximately caused by the defendant's
misrepresentations."  *Lexmark Int'l, Inc. v. Static Control
Components, Inc.*, 134 S.Ct. 1377, 1395 (2014).

Here, Defendants argue that summary judgment is warranted
because One Source has not provided any evidence supporting its
allegations of reputational harm.  One Source counters that it
has indeed presented sufficient proof of such harm, pointing to
both Mr. Jimmo's deposition testimony indicating that his
customers may now have some "negative bias" against One Source,
ECF No. 310-13 at 315, and IBM's request for a replacement unit,
ECF No. 310-13 at 313.

Ultimately, a review of the record reveals that One Source has failed to come forward with sufficient evidence to create a genuine dispute as to whether it has suffered an injury to a commercial interest in its sales or reputation.  With regard to Mr. Jimmo's testimony that some of his customers may now look less favorably upon One Source, Mr. Jimmo himself admits that his belief is only "a theory."  ECF No. 310-13 at 315.  He provides no evidence beyond his own speculation that the incident at hand caused One Source any loss of sales or reputational harm.  Moreover, as to IBM's request for a replacement unit, in the same email in which IBM makes its request for the replacement, it applauds One Source's effort in addressing the UL issue.  ECF No. 310-81 (indicating an intent to communicate to the IBM management team "One Source's integrity and cooperation").  That email cuts sharply against any alleged reputational harm.

As other courts have noted, summary judgment is appropriate on a claim brought under the Lanham Act where a plaintiff relies on "nothing more than conclusory allegations that he has suffered damage to his reputation." *Lundgren v. AmeriStar Credit Sols., Inc.*, 40 F. Supp. 3d 543, 550 (W.D. Pa. 2014) (dismissing Lanham Act claim on summary judgment).  Here, One Source has failed to cite any record evidence that supports its allegations of reputational harm.  As a result, the Court **grants**

Defendants' motion for summary judgment with respect to Count X of the TAC.

## 2. The Vermont Consumer Protection Act (Count XI)

Vermont's Consumer Protection Act "prohibits deceptive acts and practices in commerce, which a complainant must establish with proof of three elements: (1) the representation or omission at issue was likely to mislead consumers; (2) the consumer's interpretation of the representation was reasonable under the circumstances; and (3) the misleading representation was material in that it affected the consumer's purchasing decision. *Jordan v. Nissan North America, Inc.*, 853 A.2d 40, 43 (Vt. 2004). Importantly, the VCPA defines "consumer" as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services...not for resale in the ordinary course of his or her trade or business but for the use or benefit of his or her business or in connection with the operation of his or her business."

Here, Defendants move for summary judgment on grounds that One Source is not a "consumer" under the Act. Defendants contend that because One Source incorporated the FFUs into mobile clean air units for sale to customers, it acted as a "reseller" and is therefore unentitled to statutory relief.

The Court agrees with Defendants' contention. It is undisputed that One Source used the FFUs at issue to manufacture

37

ten mobile clean air units ("MCAU").  ECF No. 310-13 at 269.  Of those ten units, One Source has currently sold five to customers, with the last sale occurring in May 2014.  Although One Source claims that it has retained five of the MCAUs for use in connection with the operation of its business, its conduct demonstrates that it has primarily utilized the FFUs to manufacture products for sale.  Such use suggests that One Source is not a consumer within the meaning of the Act.  Accordingly, the Court **grants** Defendants' motion for summary judgment with respect to Count XI.

### 3. Negligent Misrepresentation (Count XII)

A claim of negligent misrepresentation may be brought against a defendant "who, in the course of his business, profession or employment supplies false information for the guidance of others in their business transactions[,]...where there is justifiable reliance on the information provided..., and where that reliance results in pecuniary loss." *McGee v. Vermont Fed. Bank, FSB*, 726 A.2d 42, 44 (Vt. 1999) (internal citations omitted).  "[P]laintiffs may justifiably rely upon a representation when the representation is not obviously false and the truth of the representation is not within the knowledge of, or known by the plaintiffs." *Id.* (internal quotation omitted).

Here, Defendants claim that they are entitled to summary judgment for two reasons.  First, Defendants assert that One Source could not have justifiably relied on the UL marks because after the purchase, One Source modified the FFUs when it installed them in its mobile clean air units.  Second, Defendants submit that One Source has not shown any actual damages resulting from the misrepresentation.

Both of Defendants' arguments lack merit.  With regard to justifiable reliance, the question at issue is not whether One Source justifiably relied on the FFUs' compliance with UL safety standards *after they were modified*, but rather whether One Source justifiably relied on the FFUs' compliance with UL safety standards *at the time of purchase*.  The parties agree that One Source's purchase of the FFUs was contingent on UL certification.  The parties further agree that the FFUs contained UL marks at the time of purchase.  Defendants do not argue One Source unreasonably relied on those marks as a signal of UL certification at the time of receipt,[10] and what One Source chose to do with the FFUs once it received them is immaterial to the question at hand.  Accordingly, Defendant's first argument cannot succeed.

---

[10] In fact, this Court previously held that One Source was under no obligation to verify the validity of the UL marks because "[t]he presence of the mark signifies that the product has already passed UL's rigorous safety and reliability checks."  ECF No. 224 at 12.

Defendants' argument regarding damages is a far closer call.  In asserting that One Source cannot show that it suffered any actual damages related to the unauthorized UL marks, Defendants indicate that they have agreed to replace the FFUs at issue with UL-approved units at no cost to One Source.  In response, One Source contends that Defendants' argument overlooks "the labor and transportation/shipping costs for One Source to retrieve the existing units; disassemble, reassemble, and test the MCAUs with the new UL-certified units; and return the MCAUs to the end-users."  ECF No. 316 at 46.  At present, it is unclear to the Court whether Defendants' offer to replace the FFUs at issue includes the costs discussed by One Source.  To the extent that the arrangement between the parties does include those costs, One Source may ultimately be unable to prove damages.  Because that question is uncertain at this time, however, the Court **denies** Defendants' motion for summary judgment as to M + W Products and M + W U.S. with respect to Count XII of the TAC.

### 4. Intentional Misrepresentation (Count XIII)

Under Vermont law, an action for fraud requires "an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the

defrauded party to his damage." *Bennington Hous. Auth. V. Bush*,
933 A.2d 207, 210-11 (Vt. 2007).

Here, Defendants argue that summary judgment is warranted
on One Source's claim of intentional misrepresentation because
One Source has failed to produce sufficient evidence indicating
that Defendants knowingly placed the unapproved UL marks on the
FFUs at issue.  In support of their argument, Defendants cite
the deposition testimony of Mr. Blaschitz in which he states
that he believes that Defendants' unauthorized use of the UL
marks resulted from either a mistake or a miscommunication
between Defendants and UL.  ECF No. 310-62 at 343-44.
Defendants assert that One Source has provided no evidence to
the contrary.

Defendants' argument is unavailing.  First, One Source has
presented clear evidence from UL itself providing that "the
labeling of [the relevant FFUs] was an unauthorized use of the
UL mark."  ECF No. 316-27 (email from Lee R. Cetrone, Senior
Market Surveillance Engineer at UL, to Eric Poehlmann, counsel
for One Source).  Second, One Source presented further evidence
from UL indicating that Defendants were well-versed in complying
with UL requirements.  ECF No. 310-66 at 75.  And third, it is
undisputed that the unauthorized UL marks were placed on 18
separate units, including two different models of FFUs.  Based
on those three facts, and drawing all permissible inferences in

favor of One Source, a reasonable jury could conclude that
Defendants, sophisticated clean room products companies,
intentionally misrepresented the UL status of the relevant FFUs.

Although the Court finds that One Source has presented
sufficient evidence of intentional misrepresentation to survive
a motion for summary judgment, it again notes that it is unclear
whether One Source will be able to prove damages on its UL-
related claims. *See supra* Section II.E.3. Given that
uncertainty, at this stage, the Court **denies** Defendants' motion
for summary judgment as to M + W Products and M + W U.S. with
respect to Count XIII of the TAC.

### F. Punitive Damages (Count IX)

Finally, Defendants move for summary judgment on One
Source's claim for punitive damages on the grounds that One
Source cannot show that Defendants acted with actual malice.
With respect to breach of contract actions, Vermont law holds
that punitive damages are available only in cases "in which the
breach has the character of a willful and wanton or fraudulent
tort, and when the evidence indicates that the breaching party
acted with actual malice." *Monahan v. GMAC Mortg. Corp.*, 893
A.2d 298, 316 (Vt. 2005). Similarly, for actions in tort,
punitive damages require "proof of patently outrageous
misconduct that also included either an element of bad motive by
definition, or were otherwise accompanied by demonstrable

42

malice." *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 996 A.2d 1167, 1175 (Vt. 2010).  Malice may be shown by "conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." *Monahan*, 893 A.2d at 316.

In the present case, summary judgment on One Source's claim for punitive damages is inappropriate.  As discussed above, One Source has presented sufficient evidence to allow a reasonable jury to find that M + W U.S. terminated the Agreement in response to One Source's request for commissions.  *See supra* Section II.C.  One Source has also produced evidence suggesting that M + W U.S.'s alleged breach of the Agreement was motivated by ill will.  *See* ECF No. 316-17 (email between M + W employees stating that "Ralf [Graeber] doesn't like [Mr. Jimmo] for multiple reasons.  He is good for us in Burlington, but not necessarily elsewhere....").  Although the bar for punitive damages is high, the theories advanced by One Source could theoretically support a claim for such relief.  Regardless, at this time, Defendants' motion is premature, as the Court will not make a ruling on whether to provide a jury instruction regarding punitive damages until it has heard the evidence evinced at trial.  Accordingly, the Court **denies** Defendants' motion for summary judgment with respect to Count IX of the TAC.

43

**CONCLUSION**

The Court **denies** One Source's motion to strike Defendants' statement of undisputed material facts.  Additionally, the Court **grants in part and denies in part** Defendants' motion for summary judgment.  The Court **grants** summary judgment on Counts VII, VIII, X, and XI.  The Court also **grants** summary judgment with respect to M + W Group on Counts XII and XIII.  The Court **denies** summary judgment on Counts I, II, and IX.  The Court also **denies** summary judgment with respect to M + W Products and M + W U.S. on Counts XII and XIII.  Finally, the Court **dismisses** Counts III, IV, V, and VI, as those claims were dismissed without prejudice in this Court's April 4, 2014 Order (ECF No. 162) and One Source has offered no explanation as to why they are now viable.

Dated at Burlington, in the District of Vermont, this 20th day of November, 2015.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
